All right, we will now hear argument in the last case on the calendar, Reilly v. Brewer. Good morning, Your Honors. Stuart Reilly. Good morning, Your Honors. Stuart Reilly, on my own behalf this morning. With regard to the — there are three issues that are contained in the briefs. With regard to the first issue of security interest-slash-offset, I submit that if it were as clear as Apelli says, that every pension plan had this implicit 100 percent offset right, then it was a meaningless inclusion for Congress to add the criteria of adequate security in 408B1E, which is the section that took interested party loans out of the prohibited transaction area and allowed them. But they specifically, among the five criteria, concluded with the requirement that there be adequate security. That further generated the administrative regulation as to what adequate security comprises that resolved whatever ambiguity that may have existed there. And that ambiguity — I'm going to ask you, I just want to make sure I understand your position. Is your position that the instrument is legitimate up to the 50 percent? Yes. Okay. What, then, is the shortfall between the 50 percent and the $230,000? How much is involved? About $500,000. Because of interest? Because of interest. Okay. Well, I see competing policy interests here. There are competing policy interests at play. And with respect to the security requirements of ERISA and the regulations, first, protecting the plan participants from rating their own retirement benefits, and second, protecting non-borrowing plan participants from the damage caused by individual participants who obtain and default on loans from the plan, which that would be you, and then there's all these other people. And given no clear authority directing a result, why shouldn't the Court protect the non-borrowing plan participants over the defaulting participants who would otherwise receive the money twice? Well, it — the only reason — That's kind of what it — you know, it — I — that there's a fiduciary duty of plan administrators to follow the regulation. Then they pass a rule to sort of CYA, as it were, but I don't think that that really — that doesn't change what the regulation is. And so, essentially, when they — when the plan — when the plan administrators give you — maybe they want to be nice to you, they want to give you that loan and all of that, they're — they're really — they have a fiduciary duty to everyone else and to not jeopardize. And so — and they didn't do that here. But now, if you — if — so we slap them for doing that, and then you get paid twice, and who ends up holding the bag are the people that didn't do anything wrong. And — Well, I think there's two points, if I may. One is with regard to the being paid twice, and I have given that a great deal of thought because that is a very compelling argument as to — that goes against me. But the only reason that in this particular case there may be this payment twice is because of the way it was mishandled by the fiduciary. But you said — you admit you'd be paid twice. Well, I — Are you admitting that? I don't — You get double-dipping. Well, to be candid, yes. Sure. Can they bring a suit against you under 502? Well, I don't think there's any evidence of damages. That's — if I may finish the one thought with regard to the payment twice, then I'll get to the issue of damages. With regard to the payment twice, in this specific case, the loan went into default and it's agreed that the loan went into default in the first quarter. And, in fact, there was history of default even predating this particular loan. I mean, I'm not — I'm not standing here proud of that fact. That just is — that just is a given fact. So it — It was an ill-conceived loan. It gave you the benefit of something. Right. But if the fiduciary acted in accords with sound banking policies or prudent demand standard, however you want to say, there was every reason for it to protect the plan if it acted — if not after that first quarter that it went into default, if it acted in the second quarter. Given that I was still employed there, there could have been withholding of salary to make up — there would have been the — They could have gotten other collateral, but then they passed this other rule to start to cover things.  Right. They could have had other collateral. They could have acted swiftly and would have been protected by the 50 percent, or at least significantly protected by the 50 percent. They could have taken other — there was a promissory note that they could have taken collection measures against. So it only turns out that there is this — an effect of a double recovery because it was tardily handled and improperly handled by the fiduciary that they just waited until the last possible moment to declare 100 percent offset. But it sort of was for your benefit, and now you're complaining because you're taking advantage of it. Well, it really wasn't for my benefit because if they'd acted early on, I wouldn't be here, I would have the pension that I'm seeking, and I would have lost it. If you had paid the loan. Right. You know, that's kind of a hard argument to swallow to say, well, if they had really taken action, we wouldn't be here. If you had paid it, they wouldn't be here. Exactly. But we are here. You're sort of saying they had a fiduciary duty to protect you from yourself as well as to protect the other plan participants. Yes. But now they still could have made the loan to you. They just needed to do other collateral. Right. So I guess my question is why can't we just treat the offset and that particular and the cap separately, and so as opposed to punishing the plan participants who had nothing to do with your failure to pay the loan and they're not honoring their fiduciary duty to both you and the participants? Well, Your Honor, there really isn't any evidence in the record that the other plan participants would be penalized. Now, they're ---- Well, but if they ---- if you win here, if you win here, that money is going to ---- You get paid twice, so that money is going to affect them. Well, the testimony has been that all other participants have been paid. That was the testimony at trial, that all other participants have been paid. Is the plan over? The plan was ---- I fumble for the right terminology, but the plan was back in 1992, the plan and the assets that were in that plan were transferred to another plan. So the plan administrator and their E&O is going to pay you? Is that what you're saying? No, I'm saying that there's clearly evidence that it was overfunded, and there's money there. There's been ---- there's never any suggestion that there isn't funds to pay or that E&O is required to come into ---- never. And that, I submit, was on the board. What would be the normal result in an overfunded plan, though, in terms of the beneficiaries of the plan? Would they receive pro grata once it's over? Not a defined benefit plan. But what happens to that money? It would revert back to the plan, the employer. Okay. When they terminate the plan. Yeah. Or whenever, yeah. Getting back to this idea of 50 percent versus 100 percent offset, as I said in the concept of a pension plan lending money, then the requirement for adequate security is a meaningless inclusion. And the regulation that the Department of Labor set forth so unequivocally is likewise meaningless. They say, if I may read this, I'm sure you've read it yourselves, but I'd like to just make it clear this morning, that in 25 ---- 29 CFR 2550, the ---- it says under Section E, adequate security, they say that with regard to plan loan programs which intend to accept a participant's vested accrued benefit as security, the dependent has also established a cap which places an upper limit on the amount of the vested accrued benefit which the plan administrator may consider for purposes of determining adequate security. I'll stop there, but they go on to say they do that upper limit of 50 percent so that, in a sense, it protects the participant from himself, or it protects or innocent beneficiaries, which is a concept. The whole overriding concern of ERISA is to preserve pension benefits. And so this is consistent with that overriding concern. So it would really be better if they don't loan anything on it, right? It would be better if they didn't, yes. They just say you can't dip into this at all, right? Or if they yes. Or if they were held to a 50 percent so that encouraged them to act more expeditiously to save the assets of the plan. So I'm going back to my other question is whether they could bring a civil enforcement action as a fiduciary to obtain appropriate equitable relief, which would have the same effect as the 100 percent offset. If you say, well, 50 percent they can do, but it would have the same effect because for equitable purposes to remedy the legal use of the 75 percent and to remedy the inequity of having somebody recover twice, could they not bring suit under that and you'd end up in the same place? I don't think they could, Your Honor. And why not? Well, you're talking about the fiduciary bringing this action? Correct. Well, I shouldn't have been as quick to say that. I haven't thought about that. I think it's a possibility, perhaps. But I think that that would be contrary to the prohibition against the 100 percent security interest. I don't think they could do that. Well, why wouldn't they? Why couldn't they do that? Because there has been, if they are incorrect and they were going to remedy that, which was taking the 75 percent, they wanted to remedy that for the equity for purposes of the plan. Well, I don't think they would have clean hands in doing it because of the ways they administered the loan. The fact that they were didn't. You're saying like a bank that makes a bad loan. Yeah. But then on the other hand, then they're going to say you don't have clean hands either because you already got paid and you got the money. So what do we do? Well, in this case, what I'm asking for is not an equitable. They're asking, in a sense, for an equitable exclusion. I'm asking for an application of the law as it's written. I'm not asking for equity. I'm asking for the remedy that I believe is deserving according to 408 and 2029 CFR 2550. It would just have more appeal if it were someone that hadn't gotten paid. I agree. But you raise a point. The other issues I'll save. My time is running out. Let me just sum up the other issues. They're fairly clear. It may be unclear to you that there is a difference in calculating prejudgment interest versus the way the plan documents calculate any underpayment. And so there was another underpayment that everyone participated in. That was calculated by the defendant's actuary according to the plan documents, according to the contract. And it was just Judge Moskowitz who thought and threw it out in the midst of the trial as to whether there should be a particular date and then prejudgment interest from that time. I think that's contrary to the contract language of the plan. Everyone else participated in it according to that way and would be discriminatory if I was treated differently. I'm not sure I understand what you say was wrong with that and what the right calculation is. Do you have that? Well, it's very — it's an actuarial calculation. And it's beyond my capacity to recite it or point to it. But it's within the voluminous language of the plan itself instructs the actuary how to, in a certain eventuality, make the payment, to calculate the payment. Well, they claim they even overpaid you by some 40-something thousand. Right. Do they? Well, that's what that's — Is that the calculation of that? That's the calculation. If you do — You really are getting paid more than what you claim. No, but see, everybody was — everybody was paid according to that method of calculation. In the midst of the trial, it occurred to Judge Moskowitz that maybe there was a different way that should apply. And he, as a bench trying the case, you know, with himself, he just threw out the concept of prejudgment interest. It's hard for me to ascertain what relief you're seeking if you don't exactly tell us what it is that you want. What I'm seeking is that it be calculated according to the plan documents, not according to the — which the prejudgment interest is as of November of 2000. Right. With interest from that date. That calculation turns out to be less than if it's calculated according to the plan documents. That's all. So I'm asking — I'm asking that the contractual language apply. How much less is it? Well, it's the $40,000. Forty? Forty. Okay. I think that's all. All right. Good morning, Your Honors. Michael Vanik on behalf of the Brewer Plans. I guess I have to say that this case to me represents a legal embodiment of the old saw that no good deed ever goes unpunished. If you look back in 1991, Mr. Riley came to the plan. He was — his home was in foreclosure. He had IRS liens against him, and he was in dire financial straits. He needed a large loan. The plan documents were amended to make it possible for him to get that loan because he had no other source of funds available. But now, can you amend — all right, it was amended, but can you amend it in violation of a regulation? You know, let me raise this about that. You can certainly amend the plan. You can give 100 percent of a plan benefit out as a loan. There is no problem with that. The only issue here with regard to what violated the regulation is the amount of the security. Now, there's no provision that says you can't secure 100 percent of any loan of any size. There's the only — But there's a reason for the security. But the reality is, is that you violated — or the plan violated the Federal regulation. Yes. By taking more — And now it could have gone and gotten other security. He didn't have other security. Right. I wonder why they have this limit on security. Well, they have the limit on security because the DOL believes that that's what the limit should be for the purpose of calculating security, not for the purpose of taking security. But the purpose is to protect the other plan participants also, too, because people that don't have the security are likely to default, just like the appellant defaulted here. And I guess we're fortunate in the sense that if what he's saying is correct, that it was an overfunded plan and all of that. But, you know, I guess this has sort of been ERISA week for us.  And what — I see plan administrators in other cases claiming that plan participants don't have standing to challenge certain things that occur because they want the money directly to — you know, they want the money directly to them, but it would all go to the plan and they can't show Article III standing because they can't show that they would actually benefit. You know, so you see plans taking this harsh view that these plan participants, when things go wrong or it becomes a distressed plan, you don't have Article III standing. And ERISA, you know, ERISA's, you know, is set out in a very comprehensive way. And then we see you coming in representing a plan administrator and say, okay, when we don't follow a regulation and that essentially we violate our fiduciary duties, we put other plan participants at risk in terms of their investments. That's a different situation. I don't think we put other plan participants at risk in terms of their investment unless — You could have. You might have. Unless the Court agrees that he's entitled to have his benefit twice, because — But then, see, here's the problem, is that ERISA is this very careful statutory structure. And what it's — the reason they have these rules is to prevent cowboy plan fiduciaries doing things precisely like they did here. So he came in and got the benefit of an oversized loan. That he desperately needed. Yeah. But, you know, the plan is not a welfare plan. It's not, you know, DHS. The plan is a fiduciary plan that's supposed to operate by the rules. So now you come in and what you say makes total equitable sense. The difficulty I have is that it doesn't fit in the statute that Congress put together. Well, I think part of the problem here is confusing security and the offset right that exists here. First of all, both the loan instrument itself provided that if at the — if he terminates employment or whatever, was entitled to a distribution, if at that time the loan wasn't repaid, then the balance of the loan due could be offset against his benefit. The plan itself contained exactly that same provision in the anti-alienation provision that I've cited. And it says this is not an alienation of benefits. And basically what it says is the same thing. That if at the time he terminates his employment or is entitled to a distribution, there is any debt that's owed to the plan. And the plan at that stage has the right to take the offset. Now, the offset is different than security. Security is an altogether different concept. This offset springs into effect at the time of, for example here, a termination and a distribution. Security springs into effect when there's a default on the loan. The participant can still be a participant in the plan, can still be getting plan benefits, can still be getting contributions to this plan, but there's been a default in the loan. And now the plan wants to enforce the provisions of the loan. So now the plan has to do that. How do they do that? Let me just stop that. How do they do that? There is a difference. You know, this has come up in other contexts in secured transactions where they make a distinction between enforcing a security interest and a unilateral unitary offset. If the plan wanted to execute on the security, what would be the procedure? It would execute on the security. It would take whatever amount of the plan. A nonjudicial execution, which is equivalent to an offset? It's similar to an offset, but it's different. The offset here is triggered by his distribution. There, the security is triggered by a default on the loan, an execution on the security agreement. There are different concepts. There's quite a few cases that have come up in the bankruptcy context, and I've cited a few of them, where they looked at whether the anti-alienation provision in ERISA plans constitutes a waiver of the offset right. And almost across the board, those cases say it doesn't. The reason why that's significant is because there are certain provisions in And basically, the theory is one that's not unlike what's going on here, that if I owe you money and you owe me money, you know, because you filed a bankruptcy doesn't mean that somehow I still owe you money, but you no longer owe me money. We offset, and that's what you have at operation here. And what I'm saying is simply this, that you had the provision in the loan instrument itself to provide for this in the event of a distribution, and you had the provision in the plan itself to provide for this in the event of distribution, and that plan, you know, goes through and has favorable termination letter issued by the Internal Revenue Service. And this provision is right in the provision that talks about the anti-alienation. And essentially, when the IRS says this plan passes muster, it's looked at the plan, it's looked at whether or not that's an anti-alienation violation, and it says no, because it issues its favorable determination letter. So the plan goes ahead and does that. Now, what he's asking for is, first of all, there was a lot of discussion, I just want to, about whether the plan's overfunded or not. The plan is not overfunded, but there's no evidence with regard to funding at all in the record, and that really should not be a consideration. Well, this offset here, did it occur at the time of distribution or the time of default? It occurred at the time of distribution. Okay. And what happens, Your Honor, just so you know, it's very typical in plans as they're administered across the country for the millions of participants that when loans can default, plan loans will default, but the administrators almost never take action at that time because the provisions that exist that allow them to offset at the time of distributions, they avoid all the additional expense necessary, you know, to exercise on the security or something, and they do it in that manner because that's simple and that's the logical way to do it. So you're saying that, in effect, because it was never enforced, that the security provision just kind of flows into another world? Well, the security provision here had no operation at all and no impact. No operational effect. But let me say one other thing, because you've raised this issue and I think it's a legitimate issue to think about. When you have a loan like this where the security is goofed up, you know, you may not have satisfied the security requirement. There's a couple of interesting things. One is that both ERISA and the Code, they only talk about the loan being adequately secured. They don't focus on what the nature of the security is or anything else like that. The DOL is the department that talks about security and talks about this limitation. But it talks about not considering more than 50%. It doesn't say you can't take more than 50%. It says you can't consider more than 50% in terms of what the security is. But here's the most important thing of this. If that happens and it's an unsecured or undersecured loan or anything, that is a prohibited transaction. Having the right security, having to comply with all those things makes a loan to an interested person who an employee participant is. It exempts it from 406, prohibited transaction provision, and that exemption occurs under 408 of ERISA. All right. Now you have a case where you have a prohibited transaction that occurred because you don't have adequate security. Technically, because, in fact, we had more than adequate security, but technically under the reg we didn't have enough. So what happens? You have a prohibited transaction. Under a prohibited transaction has to be cured. The cure for a prohibited transaction, I've cited the cases as a fact, is to pay off the loan plus interest. So you come right back full circle to exactly the same thing. And it's the participant who received the loan who has to pay it back with interest. Now I've cited four or five cases to that effect in the brief. And you can look and see. I mean, that's completely logical because it's the participant who received the benefit of the prohibited transaction to begin with. The participant actually received the planned funds. You could think of that participant as being a fiduciary under the fiduciary provisions of risk because he's now holding planned funds. Okay. So let's assume you weren't in a termination situation. Right. And we're just in the middle of the cycle. Right. Somebody comes through, your auditor comes through and says you've got a prohibited transaction here. Right. Right. So basically you call the loan, right? Right. You say pay up. Right. He says I don't have the money. Then we can. Then what do you do? Then you do sue on the contract or. No, no, you exercise the offset under. Then you exercise the offset even though it's not a termination. Right. Situation. Right. And there's, I don't know, I don't recall right offhand the case in the brief that I cite for that proposition, but there's one there. And actually the purpose of that is beneficial to the participant for this reason. The participant is subject to penalties under both the IRS and RISA for entering into a prohibited transaction. So by virtue of curing the prohibited transaction by making payment, taking the payment basically out of his plan benefits, you've cured the prohibited transaction. You saved him penalties. Let's say he wins here. He's still subject to penalties. He could be. And possibly could eat up all the. Yeah. Or more than the actual amount. Much more. Much more. There's a two-tiered penalty structure under the IRC for a prohibited transactions. One is sort of rolling 50% from the date of the prohibited transaction forward. And it rolls and it rolls and it rolls. And you look at this and you'd say you have a prohibited transaction back to 1991. Right. And there's 100% penalty also with additional for the failure to cure once you know you have a prohibited transaction. And he's made the argument he has a prohibited transaction, which I find very difficult to understand why somebody would do that. How do plan participants stop administrators from doing these things? How do they stop administrators? Let's say you know. Let's say, you know, you were. You're in the plan and you know that they're making these loans and you're concerned about. There are several ways to do it. One is if you believe that the plan administrator is not following risk, you can file an action under 502A. You file to enjoin the prohibited. Yeah. And that's in violation of the law. Right. But the most logical way a participant would do this is make a complaint to the Department of Labor. And the Department of Labor, if it thinks it's a significant situation, will come in and investigate. What would it do? Tell them. What would it do to the plan? What would the Department of Labor do? Just tell them that you can't secure more than 502A. Yeah. In this case, because this is a one-time thing done under unusual circumstances and great need by the participant. Under that circumstance, the Department of Labor is likely to just say, can't do that. You amended the plan to permit the 75 percent, change it back to 50 percent, you know, the way you should do that. Don't do that again. We realize you want to help your ---- Would they make you call the loan? They probably would because they'd view it as a prohibited transaction, which it is because of the security issue. I mean, it's one of these unusual circumstances because, in fact, you have more than enough security. But because of the way ERISA says you have to view the security, you can only look at 50 percent. Because you do, in fact, have a fiduciary duty to people like the appellant to make sure that they don't use up all their money, right? You have a fiduciary duty to try to do that. He can use up all his money if he wants to. He can take a loan of 100 percent in his plan. He just has to secure it properly. He can. If you look at ERISA and you look at the Internal Revenue Code, you will see there's no provision in either that says a participant can't borrow 100 percent of his benefit out of the plan. The only provisions that exist are, and it's really for the benefit of the plan, not the participant, let's make sure these loans are adequately secured so the plan doesn't suffer. I mean, that's the real thing. You can only do so much to protect your brother from hurting himself. But the real goal is to make sure that the plans keep their assets and all. And that's what, to me, is so tragic about this whole argument, is that the argument here is that somehow I'm entitled to get that benefit out twice. And then what do you do? Then you go chase me for it? There's no logic in that. I mean, to me it's very clear he never intended to repay the loan at all because he never made a single payment on the loan over the whole period of time. The whole reason you get to the issue of these triggers for taking it, for, you know, taking the distribution, for the time of distribution having to take anything out that way, is the fact that the loan hasn't been repaid. That's the only reason any of this happens. Had he repaid the loan as he promised he would, this never would have been an issue. So, you know, that's part of my problem. If he had called the loan. If he had called the loan, it wouldn't have gotten to this point either. No, that's true. If we had called the loan, it would have gotten to this. But you would have offset earlier, you're saying. You wouldn't have had the interest, but you would have offset if you'd called the loan because he wouldn't have had any money to pay it. We would have had to probably because Mr. Riley doesn't hear a history of bankruptcies after he left our employment and things like that. So it's logical that we would have had to do that. If it would have been payable from some other source, that would be fine. The fact of the matter is this isn't a case where a participant hasn't received his benefit. He's received 100% of his benefit. He's received it in the form of the loan that he never repaid and the distributions that were made at the end after he requested the distributions in 2000 and through the changes that were made during the lawsuit to correct the erroneous calculations that were made by the prior TPA. So he's received 100% of his benefit. There's nothing more for him to have. He's got no reason to complain about not receiving it because he got it. In fact, he got it out earlier than he should have by taking a loan that he never intended to repay. Now he wants the court to say give it to me again a second time. I don't think there's any equity in that. And I do believe, by the way, that this case does fit into the Parker case and the Korr case and the other cases like that that we cite in here because those are cases that basically said the anti-alienation provision does not prevent the plan from offsetting a breaching fiduciary's benefit where the breach occurred and damaged the plan. I think this case fits into those because although it isn't the typical breaching fiduciary context, it is a case where you have a risk of Section 406 and 408, the prohibited transaction provisions, that require you cure the prohibited transaction by getting back the loan. So I think it fits into those cases clearly. It's the same kind of thing. The plan is directly injured by the conduct. The plan is directly injured when somebody asks for a loan from the plan, promises to pay it back, and never makes any effort to pay it back, and then at the end says I don't have to pay it back at all. And by the way, I want all my benefits, too. So what would be the result if there weren't enough money in his account to pay back the loan in effect? If there weren't enough money in his account to pay back the loan at the end. At an offset situation. The fiduciary would then have to look at whether or not it's feasible using fiduciary standards to pursue him civilly for the loan. Because it's an obligation that's legally binding, and the plan does have the right to sue for that if it wants to. But a fiduciary has to look at it and make decisions that are economically reasonable to the plan. And if he were to have no assets, then the fiduciary would have to look at that and say, you know, exercising procedural diligence, which is. So are the other plan participants hurt by that? Would they be? They could possibly be. But that's a circumstance that usually doesn't happen. The only time where you see it. But they wouldn't have a right to sue the appellant. The other participants, no. The other participants have the right to their benefit. And, you know, they have it. And if they believe that the fiduciary breaches fiduciary duty, it causes a problem. They could certainly sue the fiduciary for that, too. So there are mechanisms within ERISA that will protect the participants in this case. But I did want to say one other thing, and I'm. You're out of time, but we'll let you say one. Okay. This is just a real small thing. The discussion that Mr. Riley had about the court not using the right measure of damages, I think the court was right because what it did simply is it said, okay, you demanded your distribution on November, let's say November 30, 2000. You were entitled to a certain amount as of that date. This is what that amount calculates to, and you're entitled to prejudgment interest from that date going forward. That's what the court said is the right measure. What, in fact, Mr. Riley received is exactly what he's talking about, and that's why, as you mentioned, Your Honor, he has $47,000 more. The plan, when it calculated the benefit, calculated the benefit as if he had continued in the plan all the way through to the dates when it paid it out. So that's called actuarial equivalency. That actually gave him much more than he would have got or should have got under the measure that I think is the Ninth Circuit measure, which is what are your benefits as of the date of some distribution, what's the prejudgment interest on that. Judge Moskowitz did not say you have to refund that additional money. If Judge Moskowitz had said you have to refund that additional money, maybe then he'd have an argument that might make some sense. But this is, even if what Judge Moskowitz said is not the right measure, there was no damage, no harm to him, I guess it would be harmless error because he, in fact, got exactly what he's talking about. Thank you. Okay. Thank you, Your Honor. Mr. Riley. Two matters I'd like to clear up, taking them sort of in the reverse order. It's not a question of this error in damages, error in calculation, goes to the eventuality that the case would be sent back for recalculation. Not that I didn't get what I'm entitled to. I got what everyone else got, what every other participant got when the actuary calculated an underpayment. So that's the 40 or 47,000, whatever it was. I didn't get more than anybody else. I got the same as everyone else. But if the decision of this Court is to send it back for a trial to calculate the difference between the 50 percent and the 100 percent, then I would say that the mandate should have that it's calculated according to the document, according to the planned documents, not according to prejudgment interest. Okay. And with regard to not saying or saying that I never intended to pay it back or that I'm coming before this Court to say that I won't pay it back, your very first question, Your Honor, when you asked me whether the 50 percent, whether my position was the 50 percent applied, I said the 50 percent does apply. So it's not a question of not paying anything back. It's a question of just following what the regulations dictate. The regulations say 75 percent, and you just said 100 percent. Well, I'm saying that Your Honor's question was, was I saying, I forget exactly, but the way I understood it to be was, was I that the plan had a 50 percent security interest versus or a zero percent security interest, and I said that the position of the appellant was that they had a 50 percent security interest, not a 75 percent, because, again, that's greater. I understand that. That's greater than the Department of Labor allows. But you were talking about 100 percent just about a minute ago. Well, I'm saying that that's the way the Court ruled, that there was 100 percent. And the last thing I'll say is, no matter how you attempt to parse it, an offset and a security interest are virtually one in the same. In fact, an offset is probably a superior, one of the most superior security interests that a lender can have because they are the sort of a holder of other funds from which they can recoup in the event there's a nonpayment. So to say that the plan is entitled to 100 percent offset because that is different than a security interest I don't think is legally correct. I think that if you reread what the Department of Labor says, it's very clear that they wanted a 50 percent security interest from the plan and to leave the remaining account balance unencumbered so that the primary purpose of a pension plan is achieved to provide retirement income for plan participants. Thank you very much. Thank you. I thank both of you for your argument this morning, and we're now adjourned. The case just argued is submitted. All rise. This court is session.
judges: McKeown, Callahan, Siler